# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| FLORIDA EAST COAST RAILWAY, LLC, a Florida limited liability company | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) <br> ) |
| v. | ) CASE NO.: ___1:25-cv-2720_____ <br> ) |
| FE RAIL, LLC, a Delaware limited liability company, FE GROUP HOLDINGS, LLC, SHARP FINANCING, LLC, an Illinois limited liability company, JONATHON MARKOFF, KATRINA M. MARKOFF as Trustee of THE MARKOFF FAMILY TRUST DATED AUGUST 31, 2007, FE DEMOLITION AND REMEDIATION, LLC f/k/a FE GROUP, LLC, FE DEMOLITION WEST, LLC f/k/a FEE DEMOLITION AND REMEDIATION WEST, LLC, FE OPERATIONS, LLC, FE RAIL MARTIN, LLC; WALKERS EQUIPMENT, LLC; FEX, LLC; and FE CRANE, LLC, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| Defendants. <br> _____/ | ) <br> ) <br> ) |

## COMPLAINT

COMES NOW, the Plaintiff, FLORIDA EAST COAST RAILWAY, LLC, by and through the undersigned counsel, and sues Defendants, FE RAIL, LLC, FE GROUP HOLDINGS, LLC, SHARP FINANCING, LLC, JONATHON MARKOFF, KATRINA M. MARKOFF as Trustee of THE MARKOFF FAMILY TRUST, FE DEMOLITION AND REMEDIATION, LLC f/k/a FE GROUP, LLC, FE DEMOLITION WEST f/k/a FEE DEMOLITION AND REMEDIATION WEST, LLC, FE OPERATIONS, LLC, FE RAIL MARTIN, LLC, WALKERS EQUIPMENT, LLC, FEX, LLC, and FE CRANE, LLC, and in support thereof, states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

2.      Venue is proper pursuant to 28 U.S.C. § 1391(b), as all Defendants reside in Illinois, which is the State in which this District Court is located, and a substantial part of the events or omissions giving rise to Plaintiff's claims herein occurred in Illinois.

3.      Florida East Coast Railway, LLC ("FECR") is a Florida limited liability company organized and existing under the laws of the State of Florida with its principal place of business located in Duval County, Florida.

4.      FECR is a wholly owned subsidiary of Grupo Mexico Transportes (GMXT), a Mexico corporation with its principal place of business located in Mexico City, Mexico.

5.      Defendant, FE Rail, LLC ("FE Rail"), is a Delaware limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located in Cook County, Illinois.

6.      The sole member of FE Rail is Defendant, FE Group Holdings, LLC.

7.      Defendant, FE Group Holdings, LLC ("FE Group"), is a Delaware limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located in Cook County, Illinois.

8.      The sole member of FE Group is the Defendant, Katrina Markoff, as the Trustee of the Markoff Family Trust, dated August 31, 2007 ("Markoff Family Trust").

9.      Defendant, Katrina Markoff, as the Trustee of the Markoff Family Trust ("K. Markoff"), is a citizen of the State of Illinois and resides in Cook County, Illinois.[1]

---

[1] Upon information and belief, Katrina Markoff is the sister of J. Markoff.

10.    Defendant, FE Demolition and Remediation, LLC f/k/a FE Group, LLC ("FE Demolition")[2], is an Alaska limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located in Cook County, Illinois.

11.    Defendant, FE Demolition West, LLC (f/k/a FEE Demolition and Remediation West, LLC) ("FE Demolition West"), is a Delaware limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located in Cook County, Illinois.

12.    Defendant, FE Operations, LLC ("FE Operations"), is a Delaware limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located in Cook County, Illinois.

13.    Defendant, FE Rail Martin, LLC ("FE Rail Martin"), is a Delaware limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located in Cook County, Illinois.

14.    Defendant, Walkers Equipment, LLC ("Walkers Equipment"), is a Delaware limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located in Cook County, Illinois.

15.    Defendant, FEX, LLC ("FEX"), is a Delaware limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located in Cook County, Illinois.

---

[2] FE Demolition changed its name from FE Group, LLC via a September 11, 2019 filing with the State of Alaska.

16.     Defendant, FE CRANE, LLC ("FE Crane"), is a Delaware limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located in Cook County, Illinois.

17.     FE Group is the sole member of FE Demolition, FE Demolition West, FE Operations, FE Rail Martin, Walkers Equipment, FEX and FE Crane (collectively, the "Other Subsidiaries").

18.     FE Rail, FE Group and the Other Subsidiaries shall be collectively referred to as "FE Entities."

19.     Defendant, Jonathon Markoff ("J. Markoff"), is an individual who is a citizen of the State of Illinois and who resides in Cook County, Illinois.

20.     Defendant, Sharp Financing, LLC ("Sharp Financing"), is an Illinois limited liability company organized and existing under the laws of the State of Illinois with its principal place of business located in Cook County, Illinois.

21.     Upon information and belief, the Markoff Family Trust and J. Markoff are the members of Sharp Financing.

22.     The actions giving rise to the causes of action set forth herein occurred in Cook County, Illinois.

## GENERAL ALLEGATIONS

### *FECR's Contractual Relationship with FE Rail*

23.     FECR is a Class II regional railroad that owns all of the 351-mile mainline track from Jacksonville, Florida to Miami, Florida.

24.     FE Rail is an entity involved in the scrapping and sale of metal from railcars which are sold by railroads as scrap metal.

-4-

25.     In late 2021 or early 2022, FECR solicited proposals to sell certain railcars as scrap metal (the "Scrap Cars").

26.     FE Rail responded to FECR's request for proposals by offering to purchase the Scrap Cars.

27.     FECR accepted FE Rail's proposal and FE Rail hired a contractor to start dismantling the Scrap Cars and transporting the resulting scrap metal.

28.     Based on the information provided by FE Rail regarding the weight of the Scrap Cars and the agreed pricing formula, FECR rendered three invoices to FE Rail for the Scrap Cars, totaling $882,342.01 (the "Purchase Price"), between June 22, 2022, and December 8, 2022.

29.     On or about August 22, 2022, FE Rail paid FECR $250,000.00 towards the Purchase Price.

30.     On or about October 24, 2022, FE Rail paid FECR an additional $30,000.00 towards the Purchase Price.

31.     FE Rail failed to make any other payments to FECR towards the Purchase Price and, therefore, breached its contractual obligations to FECR.

### *FECR's Florida Lawsuit and Judgment Against FE Rail*

32.     On or about October 25, 2022, FECR's Legal Department sent FE Rail a letter demanding payment of the outstanding balance of the portion of the Purchase Price owed by FE Rail to FECR at that time (the "Demand Letter").

33.     Thereafter, having not received any additional payment from FE Rail, on March 1, 2023, FECR filed suit against FE Rail in the Circuit Court, Fourth Judicial Circuit, in and for Duval County, Florida (the "Florida Court") for breach of contract, account stated, and goods sold,

seeking the unpaid amount of the Purchase Price, along with interest and costs (the "Florida Lawsuit").

34.     On April 3, 2023, a default was entered against FE Rail for failure to serve or file any paper within the timeframe prescribed by Florida law.[3]

35.     Subsequently, on April 20, 2023, the Florida Court entered a Final Judgment in FECR's favor, and against FE Rail on all of FECR's claims in the amount of $621,179.40 (the "Florida Judgment").  That amount included prejudgment interest of $18,330.39 and court costs of $507.00.  A copy of the Florida Judgment is attached as **Exhibit A**.

36.     On April 28, 2023, FE Rail filed its Motion to Vacate Final Judgment, Motion for Rehearing, and Affidavit of Jonathan Markoff with the Florida Court.

37.     On July 28, 2023, following an evidentiary hearing at which J. Markoff testified, the Florida Court entered a Consolidated Order Denying Defendant's Motion to Vacate Final Judgment and Motion for Rehearing (the "Denial Order").  A copy of the Denial Order is attached as **Exhibit B**.

38.     Thus, the Florida Judgment continues to bear interest at Florida's statutory rate.

### _Other Known Creditors of the FE Entities_

39.     FECR was not the only creditor of the FE Entities that the Markoffs would seek to thwart with their shell game.

### Axiom Lawsuit

---

[3] Under Florida law, the entry of a default against a defendant results in the defendant admitting all well pled factual allegations contained within the subject complaint.  _See Bank of Am., N.A. v. Eastridge_, 253 So.3d 722, 724 (Fla. 5th DCA 2018).  Thus, FE Rail is deemed to have admitted all of FECR's factual allegations within the Florida Lawsuit.

40. On April 22, 2022, Axiom Metals, Inc. ("Axiom") sued FE Rail in the United States District Court for the Western District of Pennsylvania (Case No. 2:22-cv-00605) (the "Axiom Lawsuit").

41. In the Axiom Lawsuit, Axiom alleged that FE Rail failed to deliver approximately $806,000.00 worth of scrap metal to Axiom between January 2021 and April 2021 as required by a contract between the parties, and that Axiom was damaged as a result.

42. FE Rail was clearly aware of the Axium Lawsuit as FE Rail served its Answer and Affirmative Defenses to Axiom's Complaint on June 28, 2022.

43. On April 15, 2024, the Honorable Cathy Bissoon entered a Judgment in the Axiom Lawsuit awarding Axiom $576,726.30 against FE Rail.

<u>Earth Services Lawsuit</u>

44. On January 2, 2023, Earth Services & Abatement, LLC ("Earth Services") sued FE Demolition d/b/a FE Rail in the United States District Court for the Northern District of Illinois (Case No. 1:23-cv-00523) (the "Earth Services Lawsuit").

45. In the Earth Services Lawsuit, Earth Services sued FE Demolition (d/b/a FE Rail) for breach of contract relating to FE Demolition's alleged failure to pay Earth Services approximately $750,000.00 for services rendered between March 2022 and August 2022 pursuant to a written contract.

46. FE Demolition was served the Earth Services Lawsuit via its registered agent on February 1, 2023.

47. On June 6, 2023, the Honorable Virginia M. Kendall entered a Default Judgment in Favor of Plaintiff by which "the Court enters judgment in favor of Plaintiff Earth Services & Abatement, LLC and against FE Demolition and Remediation, LLC d/b/a FE Rail in the amount

of $854,258.08, plus $5,000 from FE Rail to ESA reimbursing attorney's fees." (the "Earth Services Judgment").

48.     The Earth Services Judgment shows that the Court found that FE Demolition was conducting business as FE Rail, which is indicative of the misdirection inherent in the shell game alleged in detail herein.

49.     On June 9, 2023, Earth Services issued a Citation to Discover Assets to the FE Demolition (the "Citation").

50.     Pursuant to the terms of the Citation, FE Demolition is prohibited from transferring or disposing of any of its property.

51.     On August 9, 2023, FE Demolition filed its Emergency Rule 60(B)(4) & (6) Motion to Vacate Default Judgment and Order and Dismiss or Stay Citation Proceedings Due to Lack of Subject Matter Jurisdiction ("Motion to Vacate Earth Services Judgments").

52.     On December 13, 2023, the Honorable Virginia M. Kendall entered an order denying FE Demolition's Motion to Vacate Earth Services Judgment.

53.     On November 1, 2024, Earth Services filed its Motion for Sanctions Against FE Demolition and J. Markoff for Violation of the Citation to Discover Assets ("Earth Services Motion for Sanctions").

54.     The Earth Services Motion for Sanctions concerns many of the same transactions discussed herein.

Bulk Transport Lawsuit

55.     On February 1, 2023, Bulk Transport Corp b/b/a Bulk Equipment Corp. ("Bulk Transport") sued FE Rail and FE Group in the State of Indiana Laporte Superior Court No. 2 (the "Bulk Transport Lawsuit").

56. In the Bulk Transport Lawsuit, Bulk Transport alleged that FE Rail and FE Group breached their payment obligations to Bulk Transport pursuant to a series of rental agreements, and that Bulk was damaged in the amount of $1,928,328.88.

57. On February 24, 2023, FE Rail and FE Group removed the Bulk Transport Lawsuit to the United States District Court Northern District of Indiana South Bend Division (Case No. 3:23-cv-00164-MGG).

58. On December 4, 2023, United States Magistrate Judge Michael G. Gotsch, Sr. issued an Opinion and Order whereby Bulk Transport's motion for summary judgment for breach of contract was granted, and Bulk was awarded $2,096,503.09, plus attorney's fees, costs and accruing interest against FE Rail and FE Group.

59. Furthermore, in the Opinion and Order, Bulk Transport was awarded sanctions against FE Rail and FE Group relating to FE Rail and FE Group ignoring their discovery obligations relating to Bulk Transport's unjust enrichment claim in an amount that was to be determined upon presentation of evidence supporting the amount of restitution owed to Bulk Transport.

60. As a result of lawsuits and judgments referenced in this section, the FE Entities and J. Markoff had multiple known judgment creditors with judgments totaling more than $3,527,000.00, in addition to the amount of the Florida Judgment.

### *The Markoffs' Scheme to Defraud Their Creditors via a Shell Game*

61. Unbeknownst to FECR when the Florida Judgment was entered that it had become a judgment creditor of an entity, FE Rail, that was already entangled in the efforts by J. Markoff and K. Markoff, as Trustee of the Markoff Family Trust (collectively, the "Markoffs"), to defraud their numerous creditors and the creditors of the FE Entities.

62.     J. Markoff is the sole manager of FE Group.

63.     K. Markoff, as Trustee of the Markoff Family Trust, is the sole member of FE Group.

64.     Thus, between the two, the Markoffs exercise exclusive control over all of the FE Entities.

65.     Realizing that the FE Entities were the subject of numerous judgments and active litigation and were indebted to other creditors for millions of dollars, the Markoffs hatched a plan to fraudulently shield themselves and the FE Entities from their actual and prospective creditor obligations through a complicated set of transactions, amounting to a large shell game.

66.     By moving the assets and funds of the FE Entities freely between those entities and to themselves, encumbering FE Rail and the Other Subsidiaries with fraudulent debt, and creating new entity(ies), including Sharp Financing, to purchase that debt at a severe discount, the Markoffs were able to not only hide collectible assets from creditors, but were also able to shield of millions of dollars in first priority secured debt between creditors of the FE Entities or the Markoffs and those creditors' ability to collect on their claims.

67.     In order to effectuate this scheme, the Markoffs engaged in the following tactics, discussed in greater detail, *infra*:

        a.      The Markoffs did not observe any corporate formalities in their operation of the FE Entities aside from registering the companies.

        b.      The Markoffs commingled FE Rail's funds and accounts with their own funds and with funds of FE Group and the Other Subsidiaries through the exercise of their direct or indirect control.  Further, the Markoffs improperly diverted and converted FE Rail's funds and assets.

c. The Markoffs engaged in self-dealing, misappropriation of FE Rail's funds, and used FE Rail as their alter ego and own personal source of funds.

d. The Markoffs, by and through FE Group, Sharp Financing, and the Other Subsidiaries, used FE Rail as an instrument to commit fraud.

68. This resulted in FE Rail going from having approximately eighty-five employees and generating over two million dollars ($2,000,000.00) per month in revenue as recently as 2022, to having zero dollars in revenue and zero employees by the end of 2023.

69. Thus, when a creditor, such as FECR, attempted to collect on its judgment, it would discover that there was nothing there, exactly as the Markoffs intended.

70. This is only because the Markoffs used fraudulent business techniques, equivalent to sleight of hand and misdirection, to manipulate various entities in an effort to move FE Rail's valuable assets, funds, and accounts receivable elsewhere.

71. As extra security, and to ensure creditors would be left frustrated in efforts to collect on outstanding debts, the Markoffs also used their position of control over FE Group and, therefore, FE Rail, to encumber FE Rail with substantial first priority secured debt without any consideration being giving to FE Rail so that any creditor attempting to identify the assets of FE Rail would be functionally unable to collect against those assets.

72. In light of the numerous pending judgments and litigation actions against FE Rail, as well as FE Group and the Other Subsidiaries, the Markoffs began taking actions to avoid their obligations by and through their exercise and control over the FE Entities and, for the purposes of this action, FE Rail.

## *Step 1: Depletion of FE Rail's Funds and Revenue*

77.     The first step of the shell game was to deplete the funds of FE Rail in order to ensure FE Rail was uncollectable.

78.     As early as January 1, 2021, FE Rail maintained Bank Account No. xxxxxx6618 at Byline Bank (the "FE Rail/Byline Account").

79.     In 2021, the FE Rail/Byline Account averaged monthly deposits/credits in the amount of $2,556,905.75.

80.     In 2022, the FE Rail/Byline Account averaged monthly deposits/credits in the amount of $2,216,323.76.

81.     However, following FE Rail's receipt of the Demand Letter in October, 2022, and roughly contemporaneously with the filing of the Florida Lawsuit and entry of the Florida Judgment, the Markoffs, by and through FE Group or the Other Subsidiaries, began diverting deposits/credits owed to FE Rail away the FE Rail/Byline Account.

82.     This resulted in a rapid and inexplicable decline in the monthly revenue coming into the FE Rail/Byline Account.

83.     Between January, 2023 and April, 2023, monthly deposits/credits into the FE Rail/Byline Account began their freefall, with average incoming deposits dwindling to $942,139.65, a 58% decline in revenue from previous levels.

84.     In May 2023, after the Florida Judgment was entered, the total amount of deposits/credits going into the FE Rail/Byline Account dropped precipitously again – this time down to $526,981.20, a 77% decline.

85.     In June 2023, step one of the "shell game" was nearly complete, as the total amount of deposits/credits going into the FE Rail/Byline Account had almost bottomed out at $22,700.00.

86.     After two more months of meager deposits/credits, in September 2023, the total amount of incoming deposits/credits into the FE Rail/Byline Account was a mere $168.66.

87.     Step one of the Markoffs' "shell game" was completed in October, 2023, when the total amount of deposits/credits into the FE Rail/Byline Account was $0.00, and when the FE Rail/Byline Account was closed on October 11, 2022.

88.     Thus, in just over ten months' time, the Markoffs successfully diverted over $2,000,000.00 of monthly revenues from FE Rail and depleted FE Rail of all of its funds.

### *Step 2: Diversion of FE Rail's Funds to Other FE Entities*

89.     However, the apparent disappearance of revenue from the FE Rail/Byline Bank Account was not because the revenue itself disappeared; it was rather because the revenue was simply moved to other entities within the Markoffs' exclusive control.

90.     While the exact location of all of the revenue diverted from FE Rail is presently unknown due to the deceitful and fraudulent means by which the Markoffs played out their shell game, FE Demolition, another FE Entity exclusively under the control of the Markoffs, seemed to benefit significantly during this same time period.

91.     According to Dun & Bradstreet Market Identifiers, in 2021, FE Demolition had annual sales of $8,638,302.00, and 32 employees.

92.     By 2024, FE Demolition's annual sales had increased to $15,106,909, and its number of employees grew to 140.

93.     According to the FE Rail/Byline Bank Account, FE Rail's average yearly deposits/credits were in excess of $30,000,000.00 in 2021 and $25,000,000.00 in 2022.

94.     Furthermore, in the "Fact Information Sheet" filed by J. Markoff on behalf of FE Rail in the Florida Lawsuit, prior to going "out of business," indicated that FE Rail had 85 employees.

95.     Thus, it is apparent that the Markoffs moved a significant portion of the funds and revenues previously belonging to FE Rail, as well as most, if not all, of FE Rail's former employees, to FE Demolition without any apparent consideration.

96.     Additionally, FE Rail sent funds from the FE Rail/Byline Account to other shells on numerous occasions, including FE Operations and FE Rail Winnipeg which, upon information and relief, is another subsidiary company of FE Group and which is, therefore, controlled exclusively by the Markoffs.

97.     FE Rail's remaining revenues and funds, as well as any employees that were not transferred to FE Demolition, were spread across the various FE Entities, and to the Markoffs personally, again without any consideration, in an effort to ensure that any creditor who was trying to identify collectible funds or assets owned by FE Rail would instead find nothing.

### *Step 3: Contingency Plan – Saddling FE Rail and the Other Subsidiaries with Secured Debt*

98.     As part of its scheme, the Markoffs took the step of implementing a contingency plan by encumbering FE Rail, along with the Other Subsidiaries, with insurmountable secured, first-priority debt without any consideration to FE Rail or the Other Subsidiaries.

99.     As a result of this debt, a creditor such as FECR who discovered anything of value under FE Rail's, or any of the Other Subsidiaries', shell would find that such item(s) were surrounded by a seemingly impenetrable wall of secured debt in an amount far in excess of the then-current property and revenue of FE Rail.

### a.     *The Forbearance Agreement, Commercial Security Agreement, and Commercial Guaranty Agreement*

100.    In furtherance of Step 3, on May 1, 2023, FE Group, FE Rail, J. Markoff, the Markoff Family Trust, Tatianna Markoff,[4] and the Other Subsidiaries entered into that certain Forbearance Agreement and Modification to Loan Documents (Loan Nos. 2100629014 and 2101000352) with Byline Bank, an Illinois state-chartered bank ("Byline Bank") (the "Forbearance Agreement").  A copy of the Forbearance Agreement is attached as **Exhibit C**.

101.    The Forbearance Agreement related to loans taken by FE Group from Byline Bank which had a cumulative principal outstanding balance of no less than $3,696,356.46 as of the date of the Forbearance Agreement.

102.    Those loans are as follows:

a.    September 2, 2020, Business Loan Agreement (Asset Based) – Loan Number xxxxxx9014-9001 between Byline Bank and FE Group in the principal amount of $2,000,000.00 (the "September 2020 Loan Agreement").  A copy of the September 2020 Loan Agreement is attached as **Exhibit D**.

b.    June 2, 2022, Business Loan Agreement (Asset Based) – Loan Number xxxxxx9014-9001 between Byline Bank and FE Group increasing the principal amount of the September 2020 Loan Agreement to $3,000,000.00 (the "June 2022 Loan Agreement").  A copy of the June 2022 Loan Agreement is attached as **Exhibit E**.

c.    July 27, 2022, Business Loan Agreement – Loan Number xxxxxxx0352 between Byline Bank and FE Group in the principal amount of $845,449.33 (the "July 2022 Loan Agreement")[5]

(the September 2020 Loan Agreement, June 2022 Loan Agreement, and the July 2022 Loan Agreement, collectively, the "FE Group Loans").

103.    According to the terms of the Forbearance Agreement, Byline Bank approved an additional loan of $500,000.00 to FE Group for the sole purpose of paying down debts held by third parties and secured by FE Group's assets.

---

[4] Upon information and belief, Tatianna Markoff is J. Markoff's daughter.
[5] FECR does not have the July 2022 Loan Agreement in its possession as of the date of this filing.

104.    Thus, the total amount of FE Group's, and now FE Rail's and the Other Subsidiaries', indebtedness to Byline Bank under the Forbearance Agreement was at least $4,196,356.46.

105.    Prior to the Forbearance Agreement, neither FE Rail nor any of the Other Subsidiaries were a party to, nor owed any amounts under the FE Group Loans.

106.    However, FE Rail and the Other Subsidiaries are identified as "Loan Parties" in the Forbearance Agreement and, as such, became equally obligated to Byline Bank for the total outstanding amount of FE Group's indebtedness to Byline Bank.

107.    Prior to the Forbearance Agreement, the FE Group Loans were guaranteed only by J. Markoff, K. Markoff as Trustee of the Markoff Family Trust, and Tatianna Markoff.

108.    Concurrent with the Forbearance Agreement, the Markoffs (J. Markoff and K. Markoff as Trustee of the Markoff Family Trust) caused FE Rail and the Other Subsidiaries to enter into a Commercial Security Agreement with Byline Bank (the "CSA"), which pledged FE Rail's and the Other Subsidiaries' assets as security for the FE Group Loans.  A copy of the CSA is attached as **Exhibit F**.

109.    In addition, the Markoffs caused FE Rail and the Other Subsidiaries to enter into a Commercial Guarantee Agreement with Byline Bank (the "CGA"), in which FE Rail and the Other Subsidiaries each guaranteed full and punctual payment and satisfaction of the FE Group/Byline Loans.  A copy of the CGA is attached as **Exhibit G**.

110.    Since FE Rail's accounts and accounts receivable were already in the process of being depleted and diverted in accordance with Steps 1 and 2 set forth, *supra*, the amount of FE Rail's new indebtedness under the Forbearance Agreement far exceeded any monies FE Rail had, or would have, to pay its obligations under the Forbearance Agreement.

111.     Finally, Byline Bank became a prohibitive first priority secured creditor as it relates to all creditors who perfected their claim against FE Rail at a later date.

112.     Section 7(g) of the Forbearance Agreement requires that the "Loan Parties" pay Byline Bank a "Commitment Fee" of $50,000.00 by or before September 30, 2023, as partial consideration for Byline Bank entering into the Forbearance Agreement.

113.     However, the Markoffs' plan to deplete and divert the FE Entities', and particularly FE Rail's, funds, property, and accounts receivable made it such that it would be impossible to fulfill this obligation on or before September 30, 2023.

114.     Section 6(d) of the Forbearance Agreement prohibited any of the Loan Parties from selling any of its collateral absent written consent from Byline Bank.

### b.     *The June 2023 Equipment Sale*

115.     In order to ensure that the debt created by the Forbearance Agreement was sufficiently prohibitive to deter and/or thwart the efforts of valid creditors of FE Rail, the Markoffs negotiated an exception to the Forbearance Agreement's prohibition on the sale of FE Rail's assets to allow for FE Group, FE Demolition, FE Rail, and Walkers Equipment to sell certain machinery and equipment at an auction to be conducted by Levy Recovery Group, LLC on or before June 15, 2023 (the "Equipment Auction").

116.     According to Section 6(d) of the Forbearance Agreement, "[t]he Loan Parties agree that the net proceeds from the [Equipment Auction] shall be utilized solely to pay creditors holding valid and secured liens on such equipment, and all remaining sale proceeds (if any) shall be disbursed to [Byline Bank] as soon as practicable following such sale(s)."

117.     The Equipment Auction took place on or before June 15, 2023.

118.     The Markoffs, by and through FE Group, caused FE Rail to sell substantially all of its remaining valuable machinery and equipment at the Equipment Auction that had not already

been depleted or diverted by the Markoffs, and caused the proceeds from the Equipment Auction to be transferred to unknown third-parties, including, but not limited to, Byline Bank.

119.    This resulted in a complete hollowing out of FE Rail's assets which, coupled with the prohibitive debt obligations created by the Forbearance Agreement, the CSA, and the CGA, served as a fraudulent tool to subvert and avoid FE Rail's outstanding debt obligations to creditors such as FECR.

### *Step 4: Complete Control Over the Contingency Plan*

120.    After depleting and diverting the monies, revenues, and property of FE Rail and the Other Subsidiaries, the Markoffs introduced a white knight to save Byline Bank from its seemingly severely distressed position as lender.

121.    Upon information and belief, J. Markoff caused Sharp Financing, and/or other third parties, to be created as successor companies to continue FE Rail's business operations after J. Markoff, operating as manager of FE Group, had depleted the assets of FE Rail.

122.    To that effect, on September 11, 2023, J. Markoff caused Articles of Organization to be filed with the Secretary of State for the State of Illinois for a new entity called Sharp Financing, LLC (the "Sharp Financing Articles of Organization").  A copy of the Sharp Financing Articles of Organization is attached as **Exhibit H**.

123.    The Markoffs are members of Sharp Financing.

124.    J. Markoff is the manager and/or *de facto* controlling member of Sharp Financing such that J. Markoff makes all decisions on behalf of Sharp Financing.

125.    Thus, Sharp Financing is beneficially owned and controlled by the same parties that own and control the FE Entities.

126.    Monies that had been diverted and depleted from the FE Entities, including FE Rail, were apparently diverted to Sharp Financing.

127.    On September 20, 2023, after Sharp Financing's formation, and after receiving an influx of funds which had been improperly diverted and depleted from the FE Entities, including FE Rail, the Markoffs caused the FE Entities to enter into a Letter Agreement Re: Settlement and Release (Loan Nos. xxxxxx9014 and xxxxxxx0352) with Byline Bank (the "Assignment Agreement"). A copy of the Assignment Agreement is attached as **Exhibit I**.

128.    The Assignment Agreement was entered ten days prior to the deadline for the Loan Parties to pay the $50,000.00 Commitment Fee under the Forbearance Agreement.

129.    Pursuant to the Assignment Agreement, Byline Bank agreed to sell all of its right, title, and interest in the debt, securities, and guarantees established by the Forbearance Agreement, the CSA, and the CGA to Sharp Financing, so long as the Markoffs, by and through the FE Entities, met certain conditions; including, but not limited to, the following:

a.    Pay all obligations under the existing Byline Finance Group (a separate legal entity from Byline Bank) leases in accordance with a payoff letter, dated September 14, 2023, issued by Byline Finance Group to FE Group; and

b.    Transfer all right, title and interest in a Volvo EC480 Excavator (Serial No. 314465), a Volvo EC380 Excavator with GSD70 (Serial No. 314707/70293), and a Fortress FS95R Shear (Serial No. FS95147) (collectively, the "Transferred Equipment") to Byline Bank.

130.    Transferring the Transferred Equipment to Byline Bank as partial consideration for the Assignment Agreement fit into the Markoffs' continuing scheme to deplete and divert all collectible assets and monies from the FE Entities, including FE Rail, to avoid collection by the various actual and prospective creditors of the FE Entities, such as FECR.

131.    Section 5 of the Assignment Agreement requires Sharp Financing to "purchase the remaining Obligations from [Byline Bank] for a purchase price of [REDACTED] payable by wire transfer to Lender pursuant to the [Purchase and Sale Agreement of even date herewith]."

132.    The Markoffs, by and through FE Group, FE Rail, and the Other Subsidiaries, met the conditions set forth in the Assignment Agreement and Byline Bank's right, title, and interest in the debt, securities, and guarantees established by the Forbearance Agreement, the CSA, and the CGA were sold to Sharp Financing.

133.    Upon information and belief, J. Markoff, via Sharp Financing, paid approximately $750,000.00 in cash, in addition to the Transferred Equipment, to purchase Byline Bank's right, title, and interest in the debt, securities, and guarantees established by the Forbearance Agreement, the CSA, and the CGA (the "Byline Buyout"), with such funds coming, in full or in part, from FE Rail's funds diverted from the FE Rail/Byline Account.

### *Step 5: Ensuring Nothing is Under Any Shell*

134.    After the Assignment Agreement, the Markoffs not only controlled the FE Entities, but had ownership and control over the debt obligations imposed on the FE Entities by the Forbearance Agreement, the CSA, and the CGA.

135.    Using this newfound position to further their scheme to defraud the FE Entities' creditors, including those of FE Rail, the Markoffs set out on the last step of their elaborate shell game and completely eliminated the remaining assets within the FE Entities.

136.    This would ensure that, even if a creditor of one of the FE Entities was able to pierce through to any of the other FE Entities, that creditor would recover nothing.

### a.    **The UCC Sale**

137.     Therefore, on September 30, 2023, just ten days after the date of the Assignment Agreement, Sharp Financing served a Notice of Public Sale of Collateral under the Illinois Commercial Codes (the "Notice of UCC Sale"), which was scheduled to take place on October 13, 2023.  A copy of the Notice of UCC Sale is attached as **Exhibit J**.

138.     J. Markoff served the Notice of UCC Sale on behalf of Sharp Financing to himself on behalf of FE Group, FE Rail, and the Other Subsidiaries.

139.     This further illustrates that the Markoffs were using the FE Entities and Sharp Financing interchangeably.

140.     The assets to be sold at the UCC Sale included the assets of FE Group and two of the Other Subsidiaries: FE Demolition and Walkers Equipment.

141.     While none of FE Rail's assets were sold at the UCC Sale, the Markoffs knew that they had to ensure that all of the FE Entities were sufficiently hollowed out in relation to the debt obligations created by the Forbearance Agreement, the CSA, and the CGA, now held by Sharp Financing, as protection against creditors who discovered that the Markoffs were commingling funds within the FE Entities and using those entities interchangeably without any attempt to observe those entities' separate and distinct legal status.

142.     On Sunday, October 8, 2023, Sharp Financing ran advertisements in the Chicago Tribune and the Wilmington News Journal advertising the UCC Sale, which was scheduled to take place just five days later on Friday, October 13, 2023.

143.     On October 13, 2023, the UCC Sale took place at the offices of Silverman Consulting at USB Tower, One North Upper Wacker Drive, Suite 3925, Chicago Illinois.  A transcript of the UCC Sale proceedings is attached as **Exhibit K**.

144.    The only attendees at the UCC Sale were J. Markoff, Michael Silverman,[6] and Chester H. Foster Jr., the Registered Agent for Sharp.

145.    Importantly, J. Markoff, on behalf of Sharp Financing, was the only bidder to attend the UCC Sale.

146.    At the UCC Sale, substantially all assets of FE Group were purchased by J. Markoff, on behalf of Sharp Financing, for a credit bid against the debt obligations now owed to Sharp Financing, of One Million Dollars ($1,000,000.00).

147.    At the UCC Sale, substantially all assets of Walker Equipment were purchased by J. Markoff, on behalf of Sharp Financing, for a credit bid against the debt obligations now owed to Sharp Financing, of Five Hundred Thousand Dollars ($500,000.00).

148.    At the UCC Sale, substantially all assets of FE Demolition were purchased by J. Markoff, on behalf of Sharp Financing, for a credit bid against the debt obligations now owed to Sharp Financing, of Four Hundred Thousand Dollars ($400,000.00).

149.    The actual value of the assets sold at the UCC Sale greatly exceeded the amounts purportedly paid via credit bids by J. Markoff on behalf of Sharp Financing.

### b.    Transfer of the Roach Claim

150.    Furthermore, in Section 5 of the Fact Information Sheet filed by FE Rail in relation to the Florida Judgment, FE Rail identified a claim it had against Chad Roach relating to payments made by FE Rail to Mr. Roach in the amount of $54,000.00 in exchange for a Ford F-250 truck which was never delivered to FE Rail (the "Roach Claim").

---

[6] Michael Silverman is the Founder and Principal of Silverman Consulting, Inc., at whose offices the UCC Sale took place.

151.    On December 19, 2023, FE Rail transferred its claim against Chad Roach to Sharp Financing in exchange for a $30,000 credit from Sharp against FE Rail's indebtedness to Sharp via that certain "Bill of Sale/Credit Agreement." A copy of the Bill of Sale/Credit Agreement is attached as **Exhibit L**.

152.    This clearly demonstrates the Markoffs using the debt obligations now owed to Sharp Financing to completely deplete FE Rail's valuable assets.

153.    Additionally, FE Rail stated in the Fact Information Sheet that "Sharp Financing, LLC holds a lien upon all of [FE Rail's] assets to secure its claims against [FE Rail], its parent and affiliates in an amount in excess of $1 million[,]" which indebtedness resulted from the Forbearance Agreement and the later Assignment Agreement.

154.    According to the Fact Information Sheet, FE Rail is "out of business."

155.    However, FE Rail is still an active company, as reflected by the annual report filed with the Secretary of State for the State of Illinois on August 14, 2024.

156.    A copy of that annual report is attached as **Exhibit M**.

157.    Thus, the Markoffs are now merely and fraudulently propping FE Rail up as an empty "shell," and to serve as a shield and deterrent against the collection efforts of FE Rail's creditors.

158.    Amazingly, FE Rail's debt obligations were transferred, at a significant discount, and what remains is now held, in a first lien position, by an entity formed in 2023 and owned and controlled by the Markoffs.

### *The Shell Game is Complete*

159.    After the UCC Sale and other transfers, such as FE Rail's transfer of the Roach Claim to Sharp Financing, the Markoffs' shell game was complete.

160. No matter which shell a creditor attempted to pursue in the game, that shell would inevitably be empty as a result of the Markoffs' depletion and diversion of assets.

161. Further, in the unlikely event that a creditor were to locate assets, it would not be able to reach the discovered asset due to the first priority secured debt held by Sharp Financing.

162. While some of the FE Entities, including FE Demolition, appear to continue conducting work, the obligations of the Forbearance Agreement, the CSA, and the CGA are still enforced by Sharp Financing, which allows the Markoffs, through Sharp Financing, to manipulate and control the funds or assets within any of the operating FE Entities under the guise of valid debt obligations.

163. For the entities such as FE Rail that the Markoffs completely eviscerated, while still maintaining its status as a company registered to do business, a creditor has no way to discover collectible funds and assets, which is exactly the result the Markoffs intended when they set their plan in motion.

164. With the Markoffs' scheme completed, all that was left to do was to wait for creditors, such as FECR, to attempt to collect on their claims.

165. Following entry of the Denial Order, which resulted in the Florida Judgment remaining in full force and effect, FECR began its collection efforts against FE Rail,

166. On September 14, 2023, FECR filed a Motion for Writ of Garnishment to be issued against JPMorgan Chase Bank, N.A. ("Chase Bank") for the amount of the Final Judgment.[7]

---

[7] This is similar to the action taken in the Earth Services Lawsuit where, on June 15, 2023, an issuance was made after the Earth Services Judgment to JP Morgan Chase Bank as a third-party, which was, presumably, a Writ of Garnishment.

167.    However, by that time, and unbeknownst to FECR, FE Rail's funds which had been within any account at Chase Bank had already been transferred to Byline Bank pursuant to the Forbearance Agreement.

168.    Thus, Chase Bank responded to the Writ of Garnishment by stating that it had no accounts or monies of Fe Rail.

169.    Also, in discovery in aid of execution on the Florida Judgment, FE Rail provided FECR with the FE Rail/Byline Account statements, as well as the Forbearance Agreement, the CSA, the CGA, and the Assignment Agreement.

170.    As a result, FECR discovered what the Markoffs intended for all valid creditors of the FE Entities to discover, that FE Rail is in effect judgment proof, at least on the surface.

171.    There appeared to be insufficient assets or funds against which FECR could collect, particularly when considering FE Rail's debt obligation to Sharp Financing in excess of $1,000,000.00.

172.    Thus, the Markoffs were initially able to thwart the collection efforts of FECR.

173.    All conditions precedent to the causes of action set forth herein have occurred, have been performed, or have been waived by the conduct of the parties.

174.    FECR has retained the undersigned attorneys and is obligated to pay them a reasonable fee for their services rendered herein.

## COUNT I – VIOLATION OF THE ILLINOIS UNIFORM FRAUDULENT TRANSFER ACT ALL DEFENDANTS

175.    FECR incorporates by reference the allegations contained in Paragraphs 1-174 above as if fully set forth herein.

176.    FECR is a creditor of FE Rail.

177. As a result of the Florida Judgment, FECR has a right to payment that it can seek to recover from FE Rail.

178. As part of the scheme described in detail, *supra*, the Markoffs, the FE Entities and Sharp Financing, removed all of the valuable assets from FE Rail without adequate consideration including, but not limited to:

    a.  Cash;

    b.  The Roach Claim;

    c.  Equipment, including equipment sold at the Equipment Auction;

    d.  Accounts receivable;

    e.  Accounts payable;

    f.  Contracts with third parties;

    g.  The goodwill of FE Rail; and

    h.  Employees of FE Rail.

179. The Markoffs, the FE Entities and Sharp Financing, acted with actual intent to defraud FE Rail's creditors, such as FECR, and to hinder FECR's efforts to collect on the Florida Judgment against FE Rail.

180. This intent is demonstrated through their acts of fraud including, without limitation:

    a.    Transfers were made while FE Rail was insolvent;

    b.    Transfers were made to insiders or entities owned or controlled by insiders;

    c.    Transfers were concealed;

    d.    Transfers were made after FE Rail's debt to FECR was incurred;

    e.    Transfers were made after FE Rail had been sued by FECR;

f.    Transfers were made after the Florida Judgment was entered against FE Rail; and

g.    The transfers constituted substantially all of FE Rail's assets and included assets that were essential to FE Rail's business.

181.   The Markoffs, by and through the FE Entities and Sharp Financing, and other third-party recipients of the assets of FE Rail described in Paragraph 182 did not provide reasonably equivalent value for the assets they received from FE Rail.

182.   Each transfer of assets from FE Rail alleged herein constitutes a violation of the Illinois Uniform Fraudulent Transfer Act, 740 ILCS § 160/1, *et. seq.*, which is actionable under 740 ILCS §160/8(a).

WHEREFORE, Plaintiff, Florida East Coast Railway, LLC, prays that this Court enter a judgment in its favor against Defendants, J. Markoff, FE Group, K. Markoff as Trustee of the Markoff Family Trust, Walkers Equipment, FE Demolition, FE Demolition West, FE Operations, FE Rail Martin, FEX, FE Crane, and Sharp Financing, for the following relief:

a.    Attachment pursuant to 735 ILCS § 5/1-101, *et. seq.*, of the assets transferred to Defendants, J. Markoff, FE Group, the Markoff Family Trust, the Other Subsidiaries, Sharp Financing, and other third parties in a sufficient amount to satisfy FE Rail's legal obligations to FECR;

b.    Payment to FECR in an amount equivalent to the value of all assets transferred by Defendants, J. Markoff, FE Group, the Markoff Family Trust, the Other Subsidiaries, and Sharp Financing from FE Rail in a sufficient amount to satisfy FE Rail's legal obligations to FECR; and/or

c.      Appointment of receiver to take charge of all assets of FE Rail transferred by Defendants, the Markoffs, the FE Entities and Sharp Financing; and

d.      An injunction barring the Markoffs, the FE Entities and Sharp Financing from further transfer(s) of any assets transferred by or to them from FE Rail; and

e.      Such other and further relief as justice requires.

## COUNT II – CIVIL CONSPIRACY TO COMMIT FRAUD
## ALL DEFENDANTS

183.    FECR realleges the allegations contained within Paragraphs 1-174, above, and fully incorporates them by reference herein.

184.    The Markoffs, the FE Entities and Sharp Financing entered into an agreement for the unlawful purpose of defrauding FE Rail's, as well as FE Group's and the Other Subsidiaries', creditors and avoiding valid debt obligations to those creditors.

185.    At the time the conspiracy was entered, there were numerous lawsuits pending and judgments entered against FE Group, FE Rail, and various of the Other Subsidiaries, as set forth *supra*.

186.    In furtherance of the conspiracy, the Markoffs and the FE Entities entered into the Forbearance Agreement, the CSA, and the CGA, which imposed new debt obligations and guarantees in excess of $4.1 million upon FE Rail and the Other Subsidiaries for debt which had previously been owed exclusively by FE Group, and which had been fully guaranteed only by the Markoffs and Tatiana Markoff.

187.    J. Markoff, by and through his position as manager of FE Group, which itself is the sole member and parent company of FE Rail, committed the overtly tortious and unlawful act of encumbering FE Rail with those debt obligations and guarantees without adequate consideration in furtherance of the conspiracy.

188.    After the execution of the Forbearance Agreement, not only was FE Rail indebted to Byline Bank in an amount in excess of $4.1 million, with that debt also subject to the CSA and the CGA, but FE Rail was required to maintain all of its accounts at Byline Bank, and was subject to restrictions relating to the transfer of FE Rail's assets.

189.    Furthermore, and in furtherance of the conspiracy, J. Markoff, in his position as manager of FE Group, caused FE Rail to sell equipment and machinery at the Equipment Auction and caused the proceeds from the Equipment Auction to be transferred to third-parties in an effort to subvert and avoid FE Rail's outstanding debt obligations to creditors such as FECR.

190.    After execution of the Forbearance Agreement, as well as the CSA and the CGA, and in furtherance of the conspiracy to unlawfully defraud FE Rail's, FE Group's, and the Other Subsidiaries' creditors, J. Markoff, along with the Markoff Family Trust, created Sharp Financing.

191.    As alleged, *supra*, J. Markoff, along with the Markoff Family Trust are members of Sharp Financing.

192.    Sharp Financing was only created to be a purchasing entity for the debt obligations to Byline Bank created by the Forbearance Agreement, the CSA, and the CGA in an effort to further insulate FE Group, FE Rail, and the Other Subsidiaries from collection efforts by legitimate creditors and to exert full control over all elements of the Markoffs' scheme.

193.    Sharp Financing participated in the conspiracy with FE Group, FE Rail, J. Markoff, the Markoff Family Trust, and the Other Subsidiaries (collectively, the "Conspirators"), for the continued purpose of defrauding the creditors of FE Group, FE Rail, and the Other Subsidiaries, including FE Rail's creditors such as FECR, through unlawful means, which included fraudulently transferring assets and creating encumbrances without adequate consideration.

194.     Ten (10) days after Sharp Financing's creation, the Conspirators entered into the Assignment Agreement, which authorized Sharp Financing to purchase the FE Entities, debt obligations to Byline Bank under the Forbearance Agreement, the CSA, and the CGA.

195.     The scheme to enter into the Assignment Agreement was done to allow the Markoffs, through Sharp Financing, to better manipulate and insulate their "shell game" by selectively enforcing the debt obligations of the FE Entities under the Forbearance Agreement, the CSA, and the CGA to ensure that FE Group, FE Rail, and the Other Subsidiaries were all adequately shielded from collection efforts by legitimate creditors as a result of the significant debt obligations to now due to Sharp Financing.

196.     Furthermore, the scheme to enter into the Assignment Agreement was done to functionally release J. Markoff, Tatianna Markoff, and the Markoff Family Trust from their obligations as guarantors, as Sharp Financing, would not seek to enforce the guarantees of its members, J. Markoff or the Markoff Family Trust, nor of J. Markoff's daughter, Tatianna Markoff.

197.     In furtherance of this conspiracy to defraud FECR, the Conspirators committed the overt tortious and/or unlawful act of concealing the source of Sharp Financing's funding from Byline Bank, which was comprised of fraudulently transferred funds from various of the FE Entities, including FE Rail.

198.     This was done in order to secure a discount on the debt obligations created by the Forbearance Agreement, the CSA, and the CGA despite essentially using the assets and funds of the Loan Parties to provide financing for the purchase obligations contemplated within the Assignment Agreement.

199.    Thirteen (13) days after the date of the Assignment Agreement, Sharp Financing, FE Group, Walkers Equipment, FE Demolition, and J. Markoff conducted the UCC Sale to further the Conspirators' scheme to defraud creditors, including FECR.

200.    The UCC Sale was conducted despite being improperly noticed, as evidenced by J. Markoff, on behalf of the secured creditor Sharp Financing, being the lone bidder in attendance.

201.    Thus, the UCC Sale was conducted via fraudulent and deceptive means.

202.    Knowing that FE Rail's judgment debt to FECR would likely be sought to be collected against FE Group and/or the Other Subsidiaries through the means set forth herein, the Conspirators' purpose for the UCC Sale was to deplete all remaining assets of FE Group and the Other Subsidiaries which still had assets – FE Demolition and Walkers Equipment – in an effort to avoid, among other obligations, FE Rail's valid debt obligations to creditors such as FECR, and to defraud those creditors as a result.

203.    In furtherance of this conspiracy to defraud FECR, FE Group, Walkers Equipment, FE Demolition, J. Markoff, and Sharp Financing committed the overt tortious and/or unlawful act of transferring assets to Sharp Financing without adequate consideration, and without adequate notice to creditors, as part of their scheme to defraud, hinder, or delay, among other creditors of the FE Entities, FE Rail's creditors, including FECR.

204.    Additionally, in furtherance of the conspiracy, J. Markoff, as manager of FE Group, caused FE Rail to transfer the Roach Claim to Sharp for inadequate consideration - $30,000.00 in exchange for a $54,000.00 claim – as a means to further and fraudulently deplete FE Rail's valuable assets in an attempt to avoid collection efforts by FE Rail's creditors including FECR.

205.    As a result of the actions taken in furtherance of the Conspirators' fraudulent scheme, FECR has been damaged.

WHEREFORE, Plaintiff, Florida East Coast Railway, LLC, prays that this Court enter a judgment in its favor against Defendants, FE Group, J. Markoff, FE Rail, Walkers Equipment, FE Demolition, FE Demolition West, FE Operations, K. Markoff as Trustee of the Markoff Family Trust, FE Rail Martin, FEX, FE Crane, and Sharp Financing for damages, costs, pre-judgment interest, and such other and further relief as this Court deems just and proper.

### COUNT III – SUCCESSOR LIABILITY
### <u>SHARP FINANCING</u>

206.     FECR realleges the allegations contained within Paragraphs 1-174, above, and fully incorporates them by reference herein.

207.     Sharp Financing is FE Rail's successor, as set forth herein.

208.     Sharp Financing is the assignee of the Forbearance Agreement, the CSA, and the CGA, by which J. Markoff, as manager of FE Group, caused FE Rail to encumber itself and guarantee in excess of $4.1 million for FE Group's debts to Byline Bank, and to pledge all of its assets as security for FE Group's ongoing and increasing indebtedness to, at the time, Byline Bank.

209.     As assignee of the Forbearance Agreement, the CSA, and the CGA, Sharp Financing is now able to, and, in fact does, enforce the restrictions imposed on FE Rail as a "Loan Party" under the Forbearance Agreement, as well as the provisions of the CSA and the CGA.

210.     Thus, Sharp Financing is able to, and does, in fact, exercise control over the accounts receivable and accounts payable, as well as the assets, funds, and business dealings of FE Rail.

211.     While FE Rail is still a registered and active entity, it is merely a shell through which Sharp Financing operates the business previously run by FE Rail.

212. This is evidenced by J. Markoff stating, under oath in the Fact Information Sheet, that FE Rail is closed, even though FE Rail continues to make its annual filings with the State of Illinois.

213. Further, FE Rail assigned the Roach Claim, valued at $54,000.00, to Sharp Financing in exchange for a mere $30,000.00 credit against FE Rail's over $1,000,000.00 indebtedness to Sharp Financing as a result of the Forbearance Agreement, the CSA, the CGA, and later the Assignment Agreement.

214. Upon information and belief, Sharp Financing has usurped, and will continue to usurp, the accounts receivable, accounts payable, business opportunities, funds, and any equipment and assets of FE Rail pursuant to its secured credit against FE Rail's assets and its ability to enforce the terms of the Forbearance Agreement, the CSA, and the CGA.

215. This has led to Sharp Financing functionally running the business of FE Rail.

216. Pursuant to the Forbearance Agreement, the CSA, the CGA, and the Assignment Agreement, Sharp Financing is able to control what obligations FE Rail undertakes and what payments, if any, are made by FE Rail in the course of its business.

217. As a result, and because FE Rail is allegedly no longer conducting business, Sharp Financing now functionally runs the business formerly run by FE Rail, resulting in a *de facto* merger.

218. The *de facto* merger of FE Rail into Sharp Financing is demonstrated by, among other things:

    a. The manager and/or controlling member of Sharp Financing and the manager and *de facto* owner of FE Rail's holding/parent company, FE Group, are identical (J. Markoff);

b.  After merging its business into Sharp Financing, FE Rail ceased operations and is now a defunct LLC that is merely a shell and/or passthrough LLC for the benefit of Sharp Financing and, ultimately, J. Markoff;

c.  FE Rail has not dissolved only because Sharp Financing and J. Markoff intend to prevent Sharp Financing, the other FE Entities, and/or the Markoffs from being held responsible for FE Rail's liabilities;

d.  Sharp Financing, or a person under Sharp Financing's direction and control, has carried on FE Rail's business; and

e.  FE Rail transferred to Sharp Financing all of its assets and only those liabilities necessary to carry on the business.

219.   Sharp Financing is a mere continuation of FE Rail, as the two companies have the same functional management and ownership.

220.   For the above-stated reasons, Sharp Financing is liable for the debts of FE Rail under the exceptions to the restrictions on successor liability.

WHEREFORE, Plaintiff, Florida East Coast Railway, LLC, prays that this Court enter a judgment in its favor against Defendant, Sharp Financing, for damages, costs, pre-judgment interest, and such other and further relief as this Court deems just and proper.

## COUNT IV – SUCCESSOR LIABILITY
### FE GROUP (*in the Alternative to Count III*)

221.   FECR realleges the allegations contained within Paragraphs 1-174, above, and fully incorporates them by reference herein.

222.   This claim is brought in the alternative to FECR's claims in Count III, as permitted by Fed. R. Civ. P. 8(a)(3).

223.     FE Group, as sole member of FE Rail, is able to, and does, in fact, exercise control over the accounts receivable, accounts payable, funds, assets, and business dealings of FE Rail.

224.     While FE Rail is still a registered and active entity, it is merely a shell through which FE Group operates the business previously run by FE Rail.

225.     This is evidenced by J. Markoff stating, under oath in the Fact Information Sheet, that FE Rail is closed, even though FE Rail continues to make its annual filings with the State of Illinois.

226.     Furthermore, FE Group, as the parent/holding company of FE Rail, has exerted influence, power, and control over FE Rail's business transactions, and has caused FE Rail to become encumbered for FE Group's debts as a result of the Forbearance Agreement, the CSA, the CGA, and, later, the Assignment Agreement, and has caused FE Rail to transfer its funds and valuable assets, as well as its accounts payable and receivable.

227.     FE Group has usurped, and will continue to usurp, FE Rail's accounts payable, accounts receivable, business opportunities, funds, and any equipment of FE Rail in its exercise of control over FE Rail.

228.     As a result, and because FE Rail is allegedly no longer conducting business, FE Group now functionally runs the business formerly run by FE Rail, resulting in a *de facto* merger.

229.     The *de facto* merger of FE Rail into FE Group is demonstrated by, among other things:

    a.     FE Rail's sole member is FE Group;

    b.     After FE Group usurped FE Rail's business, FE Rail ceased operations and is now a defunct LLC and became a mere shell and/or passthrough LLC for the benefit of FE Group and, ultimately, J. Markoff.

      c.    FE Rail has not dissolved only because FE Group and J. Markoff intend to prevent FE Group, the Other Subsidiaries, Sharp Financing, and/or the Markoffs from being held responsible for FE Rail's liabilities.

      d.    FE Group, or a person under FE Group's direction and control, has carried on FE Rail's business; and

      e.    FE Group caused FE Rail to transfer to FE Group all of FE Rail's assets and only those liabilities necessary to carry on the business.

230.    FE Group is a mere continuation of FE Rail, as the two companies have the same functional management and ownership.

231.    Therefore, FE Group is liable for the debts of FE Rail under the exceptions to the restrictions on successor liability.

WHEREFORE, Plaintiff, Florida East Coast Railway, LLC, prays that this Court enter a judgment in its favor against Defendant, FE Group, for damages, costs, pre-judgment interest, and such other and further relief as this Court deems just and proper.

### COUNT V – SUCCESSOR LIABILITY
### FE DEMOLITION (*in the Alternative to Count III*)

232.    FECR realleges the allegations contained within Paragraphs 1-174, above, and fully incorporates them by reference herein.

233.    This claim is brought in the alternative to FECR's claims in Count III, as permitted by Fed. R. Civ. P. 8(a)(3).

234.    While FE Rail is still a registered and active entity, it is merely a shell through which FE Demolition operates the business previously run by FE Rail.

235.    This is evidenced by J. Markoff stating, under oath in the Fact Information Sheet, that FE Rail is closed, even though FE Rail continues to make its annual filings with the State of Illinois.

236.    Furthermore, FE Demolition has received transfers of funds from the FE Rail/Byline Account, has usurped FE Rail's business contracts and dealings, and has employed all or substantially all of FE Rail's now-former employees.

237.    As a result, and because FE Rail is allegedly no longer conducting business, FE Demolition now functionally runs the business formerly run by FE Rail, resulting in a *de facto* merger.

238.    The *de facto* merger of FE Rail into FE Demolition is demonstrated by, among other things:

     a.    The sole member of FE Rail is the same as the sole member of FE Demolition (FE Group);

     b.    After FE Demolition usurped FE Rail's business, FE Rail ceased operations and is now a defunct LLC and became a mere shell and/or passthrough LLC for the benefit of FE Demolition and its sole member, FE Group.

     c.    FE Rail has not dissolved only because FE Demolition, and its sole member FE Group, intend to prevent FE Demolition, FE Group, the Other Subsidiaries, Sharp Financing, and/or the Markoffs from being held responsible for FE Rail's liabilities.

     d.    FE Demolition, or a person under FE Demolition's direction and control, has carried on FE Rail's business; and

     e.    FE Demolition participated in the transfer of all of FE Rail's assets and only those liabilities necessary to carry on the business.

239.    FE Demolition is a mere continuation of FE Rail, as the two companies have the same management and ownership – FE Group.

240.    Therefore, FE Demolition is liable for the debts of FE Rail under the exceptions to the restrictions on successor liability.

WHEREFORE, Plaintiff, Florida East Coast Railway, LLC, prays that this Court enter a judgment in its favor against Defendant, FE Demolition, for damages, costs, pre-judgment interest, and such other and further relief as this Court deems just and proper.

## COUNT VI – SUCCESSOR LIABILITY
## FE OPERATIONS (*in the Alternative to Count III*)

241.    FECR realleges the allegations contained within Paragraphs 1-174, above, and fully incorporates them by reference herein.

242.    This claim is brought in the alternative to FECR's claims in Count III, as permitted by Fed. R. Civ. P. 8(a)(3).

243.    While FE Rail is still a registered and active entity, it is merely a shell through which FE Operations operates the business previously run by FE Rail.

244.    This is evidenced by J. Markoff stating, under oath in the Fact Information Sheet, that FE Rail is closed, even though FE Rail continues to make its annual filings with the State of Illinois.

245.    Furthermore, FE Operations has received transfers of funds from the FE Rail/Byline Account.

246. As a result, and because FE Rail is allegedly no longer conducting business, FE Operations now functionally runs the business formerly run by FE Rail, resulting in a *de facto* merger.

247. The *de facto* merger of FE Rail into FE Operations is demonstrated by, among other things:

   a. The sole member of FE Rail is the same as the sole member of FE Operations (FE Group);

   b. After FE Operations usurped FE Rail's business, FE Rail ceased operations and is now a defunct LLC and became a mere shell and/or passthrough LLC for the benefit of FE Operations and its sole member, FE Group.

   c. FE Rail has not dissolved only because FE Operations, and its sole member FE Group, intend to prevent FE Operations, FE Group, the Other Subsidiaries, the Markoffs, and/or Sharp Financing from being held responsible for FE Rail's liabilities.

   d. FE Operations, or a person under FE Operations' direction and control, has carried on FE Rail's business; and

   e. FE Operations participated in the transfer of all of FE Rail's assets and only those liabilities necessary to carry on the business.

248. FE Operations is a mere continuation of FE Rail, as the two companies have the same management and ownership – FE Group.

249. Therefore, FE Operations is liable for the debts of FE Rail under the exceptions to the restrictions on successor liability.

WHEREFORE, Plaintiff, Florida East Coast Railway, LLC, prays that this Court enter a judgment in its favor against Defendant, FE Operations, for damages, costs, pre-judgment interest, and such other and further relief as this Court deems just and proper.

**COUNT VII – SUCCESSOR LIABILITY**
**FE DEMOLITION WEST (*in the Alternative to Count III*)**

250.    FECR realleges the allegations contained within Paragraphs 1-174, above, and fully incorporates them by reference herein.

251.    This claim is brought in the alternative to FECR's claims in Count III, as permitted by Fed. R. Civ. P. 8(a)(3).

252.    While FE Rail is still a registered and active entity, it is merely a shell through which FE Demolition West operates the business previously run by FE Rail.

253.    This is evidenced by J. Markoff stating, under oath in the Fact Information Sheet, that FE Rail is closed, even though FE Rail continues to make its annual filings with the State of Illinois.

254.    Furthermore, FE Demolition West has received transfers of funds from the FE Rail/Byline Account.

255.    As a result, and because FE Rail is allegedly no longer conducting business, FE Demolition West now functionally runs the business formerly run by FE Rail, resulting in a *de facto* merger,

256.    The *de facto* merger of FE Rail into FE Demolition West is demonstrated by, among other things:

    a.    The sole member of FE Rail is the same as the sole member of FE Demolition West (FE Group);

-40-

    b.   After FE Demolition West usurped FE Rail's business, FE Rail ceased operations and is now a defunct LLC and became a mere shell and/or passthrough LLC for the benefit of FE Demolition West and its sole member, FE Group.

    c.   FE Rail has not dissolved only because FE Demolition West, and its sole member FE Group, intend to prevent FE Demolition West, FE Group, the Other Subsidiaries, the Markoffs, and/or Sharp Financing from being held responsible for FE Rail's liabilities.

    d.   FE Demolition West, or a person under FE Demolition West's direction and control, has carried on FE Rail's business; and

    e.   FE Demolition West participated in the transfer of all of FE Rail's assets and only those liabilities necessary to carry on the business.

257.    FE Demolition West is a mere continuation of FE Rail, as the two companies have the same management and ownership – FE Group.

258.    Therefore, FE Demolition West is liable for the debts of FE Rail under the exceptions to the restrictions on successor liability.

WHEREFORE, Plaintiff, Florida East Coast Railway, LLC, prays that this Court enter a judgment in its favor against Defendant, FE Demolition West, for damages, costs, pre-judgment interest, and such other and further relief as this Court deems just and proper.

## COUNT VIII -
## AIDING AND ABETTING FRAUDULENT TRANSFERS
## ALL DEFENDANTS (OTHER THAN FE RAIL)

259.    FECR realleges the allegations contained within paragraphs 1-174, above, and fully incorporates them by reference herein.

260.    Defendants each aided FE Rail in committing the fraudulent transfers set forth in Count I, *supra*.

261.    FE Rail performed the fraudulent transfers set forth in Count I, *supra*.

262.    The Markoffs, the FE Entities, and Sharp Financing were each aware of their respective roles in FE Rail's fraudulent scheme when they each provided their assistance to FE Rail.

263.    Nevertheless, the Markoffs, the FE Entities, and Sharp Financing each knowingly and substantially assisted FE Rail in its fraudulent scheme.

264.    As a result of that fraudulent scheme being carried out with the assistance of the Markoffs, the FE Entities, and Sharp Financing, FECR has been damaged.

WHEREFORE, Plaintiff, Florida East Coast Railway, LLC, prays that this Court enter a judgment in its favor against Defendants, J. Markoff, K. Markoff as Trustee of the Markoff Family Trust, FE Group, Walkers Equipment, FE Demolition, FE Demolition West, FE Operations, FE Rail Martin, FEX, FE Crane, and Sharp Financing, for damages, costs, pre-judgment interest, and such other and further relief as this Court deems just and proper.

### COUNT IX – ALTER EGO AND/OR MERE INSTRUMENTALITY PIERCING THE LIMITED LIABILITY COMPANY VEIL K. MARKOFF AS TRUSTEE OF THE MARKOFF FAMILY TRUST

265.    FECR realleges the allegations contained within paragraphs 1-174, above, and fully incorporates them by reference herein.

266.    FE Group is the sole member of FE Rail.

267.    K. Markoff as Trustee of the Markoff Family Trust is the sole member of FE Group.

268. K. Markoff as Trustee of the Markoff Family Trust did not observe any limited liability company formalities in its operation of FE Group or FE Rail aside from registering the respective LLCs.

269. This has resulted in there being such a unity of interest and ownership amongst K. Markoff as Trustee of the Markoff Family Trust, FE Group, and FE Rail that the separate personalities of those entities, and the members who comprise them, no longer exist.

270. K. Markoff as Trustee of the Markoff Family Trust, by and through the exercise of control over FE Group and, therefore, FE Rail, permitted and facilitated, FE Rail's insolvency.

271. K. Markoff as Trustee of the Markoff Family Trust, by and through the exercise of control over FE Group and, therefore, FE Rail, allowed FE Rail to continue in existence long past the point of insolvency and in an extremely undercapitalized state after the Forbearance Agreement, the CSA, the CGA, the Equipment Auction, and the Assignment Agreement.

272. K. Markoff as Trustee of the Markoff Family Trust, by and through the exercise of control over FE Group and, therefore, FE Rail, commingled FE Rail's funds and accounts with its own funds and with funds of FE Group, the Other Subsidiaries, and later of Sharp Financing, which the Markoff Family Trust directly or indirectly controlled.

273. K. Markoff as Trustee of the Markoff Family Trust, by and through the exercise of control over FE Group and, therefore, FE Rail, improperly diverted and depleted FE Rail's funds and assets.

274. K. Markoff as Trustee of the Markoff Family Trust, by and through the exercise of control over FE Group and, therefore, FE Rail, used FE Rail as its alter ego and engaged in self-dealing and the misappropriation of FE Rail's funds.

275.    K. Markoff as Trustee of the Markoff Family Trust, by and through the exercise of control over FE Group and, therefore, FE Rail, used FE Rail as an instrument to commit fraud.

276.    Thus, adherence to the fiction of FE Group and FE Rail being separate entities from K. Markoff as Trustee of the Markoff Family Trust would promote injustice or inequitable circumstances.

277.    FECR, as a judgment creditor of FE Rail, has been damaged as a result of K. Markoff's as Trustee of the Markoff Family Trust conduct and disregard for the independent entity of FE Rail.

278.    K. Markoff as Trustee of the Markoff Family Trust is not entitled to the protective shield of FE Group's and FE Rail's separate limited liability companies, and the Court should pierce FE Rail and FE Group's limited liability company veils and hold the Markoff Family Trust liable for FE Rail's obligations to FECR pursuant to the Florida Judgment.

WHEREFORE, Plaintiff, Florida East Coast Railway, LLC, prays that this Court enter a judgment in its favor against Defendant, K. Markoff as Trustee of the Markoff Family Trust, for damages, costs, pre-judgment interest, and such other and further relief as this Court deems just and proper.

## COUNT X – DIRECT PARTICIPANT LIABILITY
## FE GROUP

279.    FECR realleges the allegations contained within paragraphs 1-174, above, and fully incorporates them by reference herein.

280.    FE Group is the parent company, and sole member, of FE Rail.

281.    Thus, FE Group exercises exclusive control over FE Rail.

282.     Through its exercise of control over FE Rail, FE Group mandated and directed an overall business and budgetary strategy for FE Rail to fraudulently avoid FE Rail's outstanding debt obligations to creditors such as FECR.

283.     FE Group then caused FE Rail to carry out that overall business and budgetary strategy by facilitating the complete diversion and depletion of FE Rail's assets and the transfer of all of FE Rail's accounts payable and accounts receivable so that FE Rail was rendered insolvent.

284.     Financial injury to FE Rail's creditors, such as FECR, was foreseeable by FE Group at the time FE Group caused the above-mentioned business and budgetary strategy to be implemented.

285.     FE Group mandating and implementing that business and budgetary strategy was an exercise of control that surpassed the control exercised as a normal incident of ownership, and disregarded for the interests of FE Group's subsidiary, FE Rail.

286.     As a result of the overall business and budgetary strategy implemented by FE Group for FE Rail, FECR, as a judgment creditor of FE Rail, has been damaged.

WHEREFORE, Plaintiff, Florida East Coast Railway, LLC, prays that this Court enter a judgment in its favor against Defendant, FE Group, for damages, costs, pre-judgment interest, and such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Krysta K. Gumbiner
Krysta K. Gumbiner
Dinsmore & Shohl LLP
222 W. Adams, Suite 3400
Chicago, IL 60606
(312) 775-1743
Krysta.gumbiner@dinsmore.com